# MICHAEL HUESTON
### ATTORNEY AT LAW

| | |
|---|---|
| 16 COURT STREET | Tel: (718) 246-2900 |
| 35TH FLOOR | Fax: (718) 246-2903 |
| BROOKLYN, NEW YORK 11241 | Email: mhueston@nyc.rr.com |

ADMITTED NY

June 9, 2023

**BY ECF**
The Honorable LaShann DeArcy Hall
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: *United States v. Shameke Walker*, 15 Cr. 388 (S-2) (LDH)

Your Honor:

  Defendant Shameke Walker submits this supplemental sentencing letter in advance of his resentencing. For the reasons discussed, a sentence of time served on Counts One and Four (from June 16, 2015 to May 18, 2018 – 34 months) and 120 months on Count Three for a total sentence of 154 months is appropriate.

**A.**  **Preliminary Statement**

  On May 18, 2018, when the Honorable Jack B. Weinstein sentenced Mr. Walker to time served on Counts One and Four (34 months) and ten years on Count Three for a total sentence of 154 months, he had hope for Mr. Walker:

> THE COURT: I am not giving up on you. You are an intelligent man. You have a GED, right?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And then you went to try to go to college, right?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And you are intelligent. And you've had a bad deal with your mother, with your father, with a lot of other things. So there's hope for you. And I have high hopes for you. But I have really no alternative under the sentencing jurisprudence, which we now have. You understand that?
>
> THE DEFENDANT: Yes.

*See* Sentencing Transcript at 30-31 at Doc. No. 181-1, attached to April 26, 2021 Sentencing Submission.

Five years later, Judge Weinstein's *hope* has materialized with Mr. Walker, internalizing and acting on the opportunity Judge Weinstein afforded him. Mr. Walker's conduct speaks for his decision to transform and put his criminal past behind him. As surveyed in the Second Addendum to the Presentence Report:

> [Mr. Walker] has incurred no new disciplinary sanctions. He has availed himself of classes in chess, conflict resolution, ten soft skills, developing creativity, introduction to psychology, introduction to math concepts, introduction to human services, English composition, second chances, United States history, ancient Egyptian history, natural disasters, ancient Roman history, the continental drift, history of World Wars I and II, and African American history. At the present time, the defendant is studying towards a collegiate associate degree. He has paid the $300 special assessment imposed for the instant case. The defendant does not have a current work assignment but previously worked in the correctional services department, in the dining room, in snow removal, in food service, and as an orderly.
>
> \* \* \*
>
> The defendant is attending North Country Community College, in Saranac Lake, through a program offered at the Federal Correctional Institution at Ray Brook, New York, where he is studying human services, counseling, and social work. He was to have graduated in August 2023 but suspended his studies when he returned to Brooklyn for resentencing. Correspondence from the school reflects that the defendant attended from January 25, 2021, through May 12, 2022, leaving due to a transfer to another facility. The defendant plans to return either when redesignated or when released. While incarcerated he has also completed classes in financial skills. The defendant remains incarcerated, and his prison education and employment history is detailed above.

*See* Second Addendum to PSR at 4-5.

Mr. Walker's post-sentencing conduct sets the stage for this resentencing. It bears out Judge Weinstein's wisdom. He believed that Mr. Walker could evolve and mature. And it is a further reason why we are asking that Your Honor resentence Mr. Walker to time served on Counts One and Four, and ten years on Count Three. *See Pepper v. United States*, 562 U.S. 476, 492-93 (2011) (reasoning that "postsentencing conduct also sheds light on the likelihood that he will engage in future criminal conduct . . . [and] exemplary postsentencing conduct may be taken as the most accurate indicator of 'his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon his.'" (internal citation omitted); *United States v. Walker*, 252 F.Supp.3d 1269, 1294 (D. Utah 2017) ("Twenty years of prison sentences failed to accomplish the deterrence achieved by a self-motivated defendant and a tough, yet effective treatment program.").

2

This would leave his current sentence and projected release date of July 20, 2026, unchanged. Mr. Walker's sentence should focus on mental health treatment, education, and vocational training.

**B.    Case History**

    **1. <u>Charges</u>**

On July 16, 2015, the Bureau of Alcohol, Tobacco, Firearms and Explosives arrested Mr. Walker for a Hobbs Act robbery that occurred on June 13, 2015, at a grocery store in Brooklyn, New York. *See* Doc. Nos. 1 and 4. Mr. Walker was eventually indicted in a four count superseding indictment. *See* Doc. No. 41. Count One charged a violation of 18 U.S.C. § 1951(a), alleging that on or about June 13, 2015, Mr. Walker obstructed, delayed and affected commerce, and the movement of articles and commodities in commerce, by robbery of United States currency and commercial merchandise from an employee of a convenience store located at 669 Stanley Avenue, Brooklyn, New York. Count Two charged a violation of 18 U.S.C. § 1951(a) that duplicated the allegations in Count One, except added that Mr. Walker committed and threatened physical violence to John Doe # 1 and John Doe # 2 in furtherance of the robbery. Count Three alleged that Mr. Walker used a firearm in relation to Counts One and Two in violation of 18 U.S.C. § 924(c). Count Four alleged that on or about June 13, 2015, Mr. Walker was a felon in possession of Aguila 9mm Luger ammunition in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e)(1).

Mr. Walker was on supervised release in *United States v. Walker*, 07 Cr. 347 (E.D.N.Y), and charged with violations for committing the aforementioned conduct. *See* 07 Cr. 347, Doc. No. 49. Mr. Walker's violation charges were eventually dismissed. *See* Docket 07 Cr. 347, Doc. No. 61.

    **2. <u>Trial</u>**

In July 2016, Mr. Walker was found guilty of all four counts. *See* Doc. Nos. 115 and 118. There are three points to emphasize about the trial. First, Bazel Almontaser (John Doe # 1) was given immunity, because of his K2 drug dealing from the store. *See* July 12, 2016 Transcript ("Tr.") at 163-65, 184-85 and 197 at Doc. No. 181-2 attached to April 26, 2021 Sentencing Submission. Second, Almontaser never called 911 for help. *See* T. Tr. at 178. Third, throughout the case, trial counsel alerted Judge Weinstein that portions of surveillance videos of the incident were missing, videos only law enforcement or Almontaser had access to.[1] So, as we detailed in our April 26, 2021 Sentencing Submission at 5-6, at Doc. No. 181, someone suppressed the truth about the encounter.

---

[1]*See* Doc. No. 23 at p. 16 of 38 ("And Your Honor can see for yourself and has seen that the video is not complete. There are parts that have been edited out. There are sections that are not captured whatsoever and it is only Mr. Almontaser–"); Tr. at 552 ("As your Honor is aware, much of the video evidence is missing in this case. There's been ample testimony that multiple police officers checked to make sure the video evidence was operable and that they took it, and somewhere along the way it disappeared."); Tr. at p. 612 (Summation) "Now, what you're going to see over the course of our talk is that there are hours and hours of video missing in this case"); and Tr. p. 627 (Summation) ("The video cuts off right – and there's no explanation. No one is given an explanation for why these videos are edited or how they are edited.").

3

### 3. Post-Trial

Post-trial, Mr. Walker moved to dismiss Count Two as multiplicitous, which Judge Weinstein granted. *See* Doc. No. 139. Mr. Walker also moved for a new trial based on: 1) the need to dismiss Count Three for failing to state a claim; 2) the spoliation of video surveillance evidence; and 3) having an impaired juror deliberate to verdict on Counts One through Three. *See* Doc. No. 151. The motion was denied. *See* Doc. No. 154.

### 4. Sentencing

At sentencing, Mr. Walker argued that his criminal history did not make him an armed career criminal or a career offender. *See* Doc. No. 139. The Probation Department and the government disagreed. *See* Doc. No. 138. Judge Weinstein found that New York Robbery in the Second Degree, N.Y.P.L. § 160.10(1), was not a "violent felony" under the Armed Career Criminal Act ("ACCA") and that Walker was not a Career Offender, and sentenced Mr. Walker to 10 years on Count Three to run consecutive to a sentence of time served (34 months) on Counts One and Four. *See* Doc. No. 158. Judge Weinstein did not analyze Mr. Walker's Strong Arm Robbery and Assault with a Dangerous Weapon convictions under ACCA. *See* Doc No. 158. However, he did find that these convictions were "violent felonies" under the guidelines and concluded that Mr. Walker's base offense level for Count Four was 24, as per U.S.S.G. § 2K2.1(a)(2). *Id.*

### 5. Appeal

Mr. Walker appealed his convictions, arguing Count Three should have been dismissed for a failure to state a claim; and that the district court erred in deciding the above-referenced evidentiary motions against him and denying his motion for a new trial. *See* 2d Circuit Docket 18-1933, Doc. Nos. 69 and 109. The government cross-appealed Mr. Walker's sentence, raising the sole issue: whether Judge Weinstein erred in ruling that Walker was ineligible for the enhanced sentencing provision of ACCA. *See* 2d Circuit, 18-1933, Doc. No. 99. The parties filed supplemental briefs about whether *Rehaif v. United States*, 139 S. Ct. at 2191 compelled reversal of Mr. Walker's conviction for violating 18 U.S.C. § 922(g)(1), Count Four. *See* 2d Circuit, 18-1933, Doc. Nos. 122, 128 and 130.

The Second Circuit issued its Opinion on September 11, 2020, denying Mr. Walker's appeal, agreeing with the government, and concluded that the district court erred in determining that New York Robbery in the Second Degree is not a "violent felony" for purposes of ACCA and remanded the case for resentencing to determine if Mr. Walker's two other "violent felonies" qualified as predicates under ACCA. *See* 2d Circuit, Doc. No. 18-1933, 148; *see also United States v. Walker*, 974 F.3d 193 (2d Cir. 2020). He filed a petition for a rehearing and for a rehearing *en banc*, and a motion to stay the mandate, which were all denied. 2d Circuit, 18-1933, Doc. Nos. 169 and 180. His writ for petition for certiorari was denied. *See Walker v. United States*, 20-7183.

### 6. Intervening Cases Post-Remand

The Second Circuit has remanded this case to determine if Walker's convictions for: South Carolina Strong Arm Robbery, South Carolina Penal Law, 16-11-330(A) ("Strong Arm Robbery"); and Aiding and Abetting Assault with a Dangerous Weapon with Intent to Do Bodily Harm, 18 U.S.C. § 113(a)(3) ("Assault with a Dangerous Weapon") qualify as "violent felonies"

4

pursuant to the Armed Career Criminal Act, 18 U.S.C. § 924(e), and further proceedings consistent with its Opinion.  *See United States v. Walker*, 974 F.3d at 193.

Since the remand, the Second Circuit has found that Hobbs Act Robbery (Count One) is not a crime of violence U.S.S.G. § 4B1.2(a).  *See United States v. Chappelle*, 41 F.4th 102 (2d Cir. July 21, 2022).  So, Mr. Walker cannot be a career offender under the guidelines.  The government and the Department of Probation agree on this point.  *See* Second Addendum to the PSR and the Government's May 12, 2023 letter to the Court at Doc. No. 196.

The Supreme Court also decided *Wooden v. United States*, 142 S. Ct. 1063 (2022).  In *Wooden*, the Supreme Court addressed the "occasions clause" in ACCA and explained that "[c]onvictions arising from a single criminal episode can count only once under ACCA." *Id.* at 1067; *see id.* at 1069 ("[M]ultiple crimes may occur on one occasion even if not at the same moment.").  Deciding whether two or more convictions occurred on different occasions involves a "multi-factored" inquiry, and "a range of circumstances may be relevant to identifying episodes of criminal activity." *Id.* at 1070-1071.  This did not happen at Mr. Walker's trial, so ACCA does not apply to him.

While the Probation Department has advised the Court in the Second Addendum to the PR it believes ACCA is still applicable, the government has advised the Court that it would no longer seek the application of ACCA because a jury had not found the predicate offenses triggering ACCA's penalty provision to have been committed on occasions different from one another.  *See* Second Addendum to the PSR and the Government's January 28, 2023 and May 12, 2023 letters to the Court at Doc. Nos. 194 and 196.

**C.     Objections to the Presentence Report and Addenda**

Mr. Walker made his original objections in his March 6, 2018 letter to the Department of Probation.  *See* Doc. No. 150-1.  We raise the following objections.

¶ 15:  The 2021 Guidelines Manuel should be used.  *See* U.S.S.G. §1B1.11(a).

¶¶ 5, 11, 23, 28, 29, 30, 32, 33, 35, 88, 89:  The Probation Department and the government agree that Mr. Walker is not a career offender.  *Chappelle*, 41 F.4th at 102.

As discussed *supra*, Mr. Walker objects to the applicability of ACCA to him because of *Wooden*.  This is dispositive.  However, we also refer to our previous objections as stated in our April 26, 2021, Sentencing Submission at Doc. No. 181 at 7-11, regarding the inapplicability of Mr. Walker's Strong Arm Robbery and Assault with a Dangerous Weapon convictions, and our June 14, 2021 letter to the Court, which discusses the Supreme Court's decision in *Borden v. United States*, 141 S. Ct. 1817, 1830 (2021), to argue that ACCA should not apply because the defendant's prior conviction for federal assault could have been committed with a reckless state of mind.  *See* Doc. No. 183.

We submit that Mr. Walker's guidelines are as follows:

**Count One**, level 24, as per U.S.S.G. § 2B3.1(b)(3)(B).

**Count Four**, level 24, as per U.S.S.G. § 2K3.1(a)(1).

5

**Counts One** and **Four** are grouped as one unit, as per U.S.S.G. §§ 3D1.2(a) and 3D1.4.

**Count Three** is not grouped, as per U.S.S.G. §§ 2K2.4(b) and 3D1.1(b). *See* 18 U.S.C. § 924(c)(1)(A).

Walker's Criminal History Category is V.

Thus, Mr. Walker's guideline range on **Counts One** and **Four** is 92 to 115 months. On **Count Three** Walker is subject to 18 U.S.C. § 924(c)(1)(A)(iii)'s minimum term of imprisonment of 10 years. The final guideline range is, thus, 212 to 235. Notably, this is the same total guideline calculation and criminal history category Judge Weinstein determined. *See* Doc. No. 158 at 24.

The government's U.S.S.G. § 2K2.1(c)(1) analysis is wrong because the cross-referenced offense is Hobbs Act robbery, 18 U.S.C. § 1951(a) – which is the proven conduct – not 18 U.S.C. § 1111. Again, Count Two was dismissed. Further, the jury made no finding regarding the *mens rea* for 18 U.S.C. § 1111. *See Stevenson v. United States*, 162 U.S. 313, 320 (1896) (Malice aforethought, as provided in 18 U.S.C. § 1111(a), is the distinguishing characteristic which, when present, makes a homicide murder rather than manslaughter.). *Cf. United States v. Abdullah*, No. 06-4970, 2007 U.S. App. LEXIS 16762, at *12 (4th Cir. July 13, 2007) ("At sentencing, the Government stated that Abdullah stipulated to malice aforethought. The district court determined Abdullah acted with premeditation. The court cited Lane's statement that Abdullah said he was going to shoot for real and Boyd's testimony that Abdullah told him to give him the gun because he knew what to do with it. We find that these facts demonstrate that Abdullah consciously and maliciously fired into the crowd of people and the first degree murder cross reference was appropriate.").

**D.     The Mandate**

On remand, given *Wooden*, there is no basis for deciding if Mr. Walker's two other "violent felonies" qualify as predicates under ACCA, so Mr. Walker's sentence should remain undisturbed.

The government already raised the issues of Mr. Walker's criminal history and background, and purported "gang" involvement, at his last sentencing, *see* Doc. No. 149 and did not appeal that part of Judge Weinstein's decision sentencing Walker below the guideline range. 2d. Circuit, 18-1933, Doc. No. 99. While there appears to be no bright line rule that forecloses a party who has not raised a particular sentencing issue on appeal to ask for a full resentencing, where a case is remanded to the district court for further proceedings, the mandate rule "compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *United States v. Ben Zvi*, 242 F3d 89, 95 (2d Cir. 1001); *see United States v. Minicone*, 994 F.2d 86, 89 (2d Cir 1993) (where Second Circuit rejected defendant's claim of entitlement to mitigating role adjustment, district court could not grant adjustment on remand).

The mandate rule prohibits consideration of issues that could have been, but were not, raised at the time of the initial appeal "unless the mandate can reasonably be understood as permitting [the district court] to do so." *Ben Zvi*, 242 F.3d at 95. Thus, where the Second Circuit affirmed a conviction, but remanded for resentencing, the district court was prohibited by the mandate rule from considering a defendant's new challenge to his conviction. *Id.* Likewise,

6

where a case was remanded for resentencing on a limited issue, the mandate rule did not permit the district court to consider other sentencing claims. *See United States v. Thorn*, 446 F.3d 378, 385 (2d Cir. 2006); *United States v. Carpenter*, 320 F.3d 334, 341 (2d Cir. 2003). "[A]bsent explicit language in the mandate to the contrary, resentencing should be limited when the Court of Appeals upholds the underlying convictions but determines that a sentence has been erroneously imposed and remands to correct the error." *Quintieri*, 306 F.3d at 1230; *see also United States v. Malki*, 718 F.3d 178, 182-83 (2d Cir. 2013) (ambiguity in mandate resolved in defendant's favor to preclude resentencing where the government sought sentencing enhancement on remand).

While a reversal for sentencing error does permit a resentencing where the reversal "effectively undoes the entire 'knot of calculation' of the original sentence, *see Quintieri*, 306 F.3d at 1228*; see United States v. Johnson*, 378 F.3d 230, 241 (2d Cir. 2004), given the mandate's directive and the intervening case law, there is no basis to disturb Mr. Walker's sentence. This is not a situation where the government did not have an opportunity or incentive to raise these issues. *Quintieri*, 306 F.3d at 1229 ("We have explained that "'it would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost.'") (internal citations omitted).

Finally, we note that the Second Circuit did not explicitly call for a full resentencing here, which indicates that given the present legal posture of the case the sentence should remain unchanged. *Cf. Pepper v. United States*, 562 U.S. 476, 507, 131 S. Ct. 1229, 1251 (2011) ("Because a district court's 'original sentencing intent may be undermined by altering one portion of the calculus,' *United States v. White*, 406 F.3d 827, 832 (CA7 2005), an appellate court when reversing one part of a defendant's sentence "may vacate the entire sentence . . . so that, on remand, the trial court can reconfigure the sentencing plan . . . to satisfy the sentencing factors in 18 U.S.C. § 3553(a),' *Greenlaw v. United States*, 554 U.S. 237, 253, 128 S. Ct. 2559, 171 L. Ed. 2d 399 (2008). That is precisely what the Eighth Circuit did here." But that is not what has happened here.

### E.     Mr. Walker's Background and Characteristics

As argued at Mr. Walker's last sentencing, his 18 U.S.C. § 3553(a) factors justify a downward variance to time-served on Counts One and Four, and 10 years on Count Three. Information relating to Mr. Walker's background and characteristics is detailed in the PSR at ¶¶ 56-87, Addenda to the PSR, and in his letter of support.[2] The following discussion draws from this source material and other items where noted.

Shameke is a 49-year old African-American citizen of the United States. He was born to the consensual union of James Kearse and Delores Walker in Brooklyn, New York. Mr. Kearse and Ms. Walker had a second son who died when Shameke was a boy. After his baby brother's death, Shameke had minimal contact with his father. At age 18, he forever lost the opportunity to know his father, when Mr. Kearse was murdered in South Carolina. Shameke's mother abused alcohol and drugs throughout Shameke's childhood. She would leave her young son alone for extended periods of time. On one of these occasions, the New York City Administration for Children's Services ("ACS") placed Shameke in foster care. When his maternal grandmother, Joanne Walker, learned of this placement, she assumed custody of him.

---

[2]*See* Doc. No. 150-3.

7

Shameke did not return to his mother's care until 1992. However, his mother continued to use drugs until the birth of his maternal half-sister, who was born addicted to crack cocaine. After further ACS involvement, his mother eventually stopped using drugs. Shameke resided in Brooklyn until 1995, except while incarcerated from March 1991 through September 1992. In 1996, Shameke relocated to Orangeburg, South Carolina, where he lived until 1999, when he was incarcerated. After being released in 2006, he returned to Brooklyn.

Although Shameke describes his upbringing as "middle class," it clearly was not. Shameke grew up economically and emotionally impoverished in an environment known to result in severe psychological trauma during childhood development, which manifests as hopelessness, depression, aggression, impulsivity, delinquency and a reliance on gangs to counteract feelings of despair and powerlessness.[3]

Shameke, who was not only neglected and emotionally abused as a child, has a history of mental illness. He was designated by the Department of Education as an emotionally disturbed child and placed in special education classes. He has a history of depression, suicidal ideation and psychosis, resulting in a psychiatric hospitalization.

While incarcerated at Spofford Detention Center in the Bronx, at age 14, he was charged with an additional offense but was told that if he completed psychiatric treatment, the charges would be dismissed. Shameke was placed at Bellevue Children's Psychiatric Hospital, in New York, New York, for three months in 1988, but as his problems did not improve, he was transferred to the Manhattan Children's Psychiatric Center in 1989.

Shameke also has a history of substance abuse, including alcohol, marijuana and K-2 (synthetic marijuana) use. He has fought to recover and maintain sobriety by completing treatment for alcohol and substance abuse dependency that included individual and group counseling, and received mental health services.

Shameke attended Thomas Jefferson High School, in Brooklyn,[4] for two months in 1988, but withdrew due to psychiatric problems and a prior local arrest. Mr. Walker obtained his General Educational Development Diploma through a program offered at Alianza Dominicana, in New York, New York, in 1993. He attended one semester of college at LaGuardia Community College, in Long Island City, but eventually withdrew. Before his incarceration in this matter, Shameke made efforts to learn medical billing and coding.

---

[3] *See* Department of Justice, Archives, *Defending Childhood*, https://www.justice.gov/archives/defendingchildhood.

[4] *See Thomas Jefferson High School*, Wikipedia, ("Thomas Jefferson High School was a high school in the East New York section of Brooklyn, New York), https://en.wikipedia.org/wiki/Thomas_Jefferson_High_School_(Brooklyn); *East New York, Brooklyn,* Wikipedia*, Social Problems* ("Since the late 1950s East New York has had some of the highest crime rates in Brooklyn, and is considered by some to be the borough's murder capital, alongside Brownsville. Many social problems associated with poverty from crime to drug addiction have been prevalent in the area for decades. Despite the decline of crime compared to their peaks during the crack and heroin epidemics, violent crime continues to be widespread in the community); and Demographics ("The racial makeup of the neighborhood was 63.6% (58,453) African American, 3.0% (2,764) Asian, 1.3% (1,240) White, 0.3% (291) Native American, 0.0% (38) Pacific Islander, 0.7% (683) from other races, and 1.3% (1,237) from two or more races. Hispanic or Latino of any race were 29.6% (27,252) of the population."), https://en.wikipedia.org/wiki/East_New_York,_Brooklyn.

Shameke has never been married. His only child, a daughter, died at age two from respiratory problems that she suffered from birth. The child's health problems followed from those of her mother, Rushia Williams, who had hypertension and adult-onset diabetes at the start of her pregnancy and suffered a stroke and a heart attack during the pregnancy. Although they are not in a relationship, Ms. Williams is still close with Shameke. She has three biological children and five adoptive children. They are aware of Shameke's current legal circumstances and remain supportive.

Shameke had been involved in a relationship with Minyon Mitchell since 2006 and lived with her from 2013 until he was arrested in this case. In March 2014, Ms. Mitchell miscarried their child during her second trimester. Ms. Mitchell has three minor children from previous relationships. Ms. Mitchell and her children have been negatively affected by Shaneke's legal situation.

Shameke has been incarcerated since his July 2015 arrest, and has participated in many Bureau of Prison ("BOP") educational programs, and as mentioned above, has enrolled in North Country Community College, in Saranac Lake.[5]

In discussing Shameke's 18 U.S.C. 3553(a) factors, *see* Doc. No. 158 at 23, Judge Weinstein highlighted that: "Walker [was then a] 44 year-old United States citizen. *See* PSR at ¶ 2. Because of his mother's drug addiction, he was removed from her home as a young child and placed in foster care. PSR ¶ 58. He was first incarcerated at age 14. PSR at ¶ 71. Since 1998, he has been out of custody for less than 3 years. PSR at ¶¶ 42-46."

F.  **18 U.S.C. § 3553(a) Factors**

This Court is not required to impose a sentence based on the guidelines or any Sentencing Commission policy that circumvents Congress's specific intent for individualized sentencing. *Pepper v. United States*, 562 U.S. 476, 501 (2011). Further, an individual assessment that considers Mr. Walker's character and background, including his childhood neglect, abuse, and mistreatment, supports a non-guideline sentence as "sufficient, but not greater than necessary" to achieve the sentencing objectives in this case. *See* 18 U.S.C. § 3553(a)(1).

Notably, the guidelines fail to include critical factors about Mr. Walker's background, which Congress mandated must be included in arriving at the sentence to be imposed. *See* 18 U.S.C. § 3553. When offenders' backgrounds and characteristics are ignored, marginalized, or reduced to second-class status, the goal of informative, individualized sentencing cannot be achieved. Rather, offenders are left to the mercy of mathematical numbers that arrive at terms of incarceration with no empirical relationship to either punishment or the causes that brought them before the court. *See generally United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (court commenting on "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); Anthony M. Kennedy, *Speech at A.B.A. Annual Meeting* (Aug. 9, 2003) (criticizing the guidelines as "too severe" and called for a general, across-the-board reduction in guidelines sentences).[6] But in asking for a variance for

---

[5]*See* Doc. No. 150-2 (BOP Certificates); and Doc. No. 181-3, (BOP Certificates). *See also* Second Addendum to PSR at 4-5.

[6]*See* https://www.supremecourt.gov/publicinfo/speeches/sp_08-09-03.html.

9

Mr. Walker, it is worth deconstructing the Sentencing Commission's position regarding its mission, as we believe it shows why the guidelines are so flawed and heavy-handed.

The Sentencing Reform Act ("SRA"), enacted in 1984, created the Sentencing Commission and instructed it to promulgate guidelines that would reconcile the multiple purposes of punishment while promoting the goals of uniformity and proportionality. *See* 28 U.S.C. §§ 991(b)(1)(A) and 991(b)(1)(B). That sounds reasonable. And under the SRA, the Commission was directed that it should "develop a sentencing range that is consistent with the purposes of sentencing described in section 3553(a)(2) of Title 18, United States Code," 28 U.S.C. § 994(m), and "establish sentencing policies and practices" that reflect "advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1)(C). That also sounds reasonable.

However, notably absent in the Commission's mission was 18 U.S.C. § 3553(a)(1)'s mandate, which states that "in determining the particular sentence to be imposed, [the court] shall consider – (1) the nature and circumstances of the offense and the history and characteristics of the defendant[.]" Compare 18 U.S.C. § 3553(a) to 28 U.S. Code §§ 991 (United States Sentencing Commission; establishment and purposes) and 994 (Duties of the Commission).

As stated in 28 U.S.C. §§ 991 and 994, the Commission's purposes and duties are to support 18 U.S.C. § 3553(a)(2)'s goal: "the need for the sentence imposed…." *See* 28 U.S.C. §§ 991 and 994. Neither code references 18 U.S.C. § 3553(a)(1), which undercuts the Commission's purported goal of the "advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1)(C). This omission, and strange oversight, is one of the reasons why the guidelines are so skewed against defendants and why, we submit, courts are not required to impose a sentence based on them. *Pepper v. United States*, 562 U.S. at 501.

This is why courts must be careful to guard against the "unintended anchoring effect that the [G]uidelines can exert" leading to "irrationally assign[ing] too much weight to the guidelines range[] just because it offers some initial numbers." *United States v. Ingram*, 721 F.3d at 40 n.2 (internal quotation marks and citations omitted); *see generally* Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" And "Blind Spot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw*, 104 J. Crim. L. & Criminology 489 (2014).

1. **Lack of Guidance as a Youth and Similar Circumstances, Race and Socioeconomic Status**

Mr. Walker's life, like so many offenders, is one of lost potential. While Shameke is not blameless, he is not responsible for the horrendous circumstances in which he was born and raised. His life was beset with obstacles and mired by failed parents and institutions. He fended for himself in foster care and the streets, began committing crimes, and was placed in juvenile and correctional institutions while associating with other lost young men like himself. His convicted conduct reflects a bleak outlook that so many in our society share, a cognitive virus amplified in media and politics that glamorizes consumption and hype while treading on empathy and simple hard work. This distorted view has many parents, but primary among them is the hopelessness that can consume a person who has come to believe that their life and the lives of others have little or no value. Nevertheless, Shameke is resilient and determined. He

10

has many positive qualities and deserves our support, and his sentence should focus on education, training, and providing him with substance abuse and mental health services.

Shameke grew up in poverty in Brooklyn, New York. And by this point in our history, it is a casual observation to say that such neighborhoods can warp the lives of their residents. Segregation and race must matter in sentencing. Segregation is the weaponization of space. It creates zones for the unequal application of law and policy and the systemic abuse of targeted groups. Groundbreaking journalist and urban theorist, Jane Jacobs, had this to say about segregation:

> A ghetto, by the very fact that it is a ghetto, is a place in which most people of spirit, especially the young who have not learned resignation, will not stay entirely willingly. This is true no matter how objectively good their physical accommodations and social surroundings may otherwise be. They may have to stay. They may diversify with the ghetto considerably. But this is far from the same as acceptance and glad attachment. It is fortunate, in my opinion, that so many of our ghetto dwellers do not feel resigned or defeatist; we would have far more to worry about as a society if we could easily get away with our tendencies towards master-race psychology. But be that as it may, the fact is that in our ghettos live people of spirit, and they don't like ghettos.[7]

While Jacobs acknowledged not everyone is broken by segregation or wants to leave their communities, she observed that the stigma of segregation siphons human capital from these neighborhoods, "I think inner cities will go on losing too much of the Negro middle class as fast as it forms until, in actual fact, the choice of remaining there no longer means, for a colored person, an implied acceptance of ghetto citizenship status."[8] It is the stigma of confinement, along with its racist underpinning, that is so debilitating. It is why Justice Henry Billings Brown argued so perniciously in its defense:

> We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that construction upon it.

*Plessy v. Ferguson*, 163 U.S. 537, 551 (1896). But, of course, that is segregation's aim: to enforce a mindset of inferiority, as policy, against its targets. *See Brown v. Board of Education,* 347 U.S. 483, 494 (1954) ("To separate [children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.").

While segregation does not cripple all its targets, it injures many and impedes and interferes with most. Nevertheless, the guidelines dogmatically assert that race, national origin, and socioeconomic status "are not relevant in the determination of a sentence." *See* U.S.S.G. §

---

[7] *See* Jacobs, Jane, *The Death and Life of Great American Cities*, at 283-84.

[8] *Id.* at 285.

11

5H1.10. This is, in spite of the fact, that while African-Americans and whites use drugs at similar rates, the imprisonment rate of African-Americans for drug charges has been almost six times that of whites.[9] This is, despite the fact, that overall African-Americans are incarcerated at much higher rates than whites and Hispanics, causing the Pew Research Center to find:

> Black *men* are especially likely to be imprisoned. There were 2,272 inmates per 100,000 black men in 2018, compared with 1,018 inmates per 100,000 Hispanic men and 392 inmates per 100,000 white men. The rate was even higher among black men in certain age groups: Among those ages 35 to 39, for example, about one-in-twenty black men were in state or federal prison in 2018 (5,008 inmates for every 100,000 black men in this age group).
>
> The racial and ethnic makeup of U.S. prisons continues to look substantially different from the demographics of the country as a whole. In 2018, black Americans represented 33% of the sentenced prison population, nearly triple their 12% share of the U.S. adult population. Whites accounted for 30% of prisoners, about half their 63% share of the adult population. Hispanics accounted for 23% of inmates, compared with 16% of the adult population.[10]

This is, despite the fact, for example, for years in New York City, there was a deliberate policy of "stop-and-frisk" that targeted minorities. *See, e.g*, *Floyd v. City of N.Y.*, 959 F. Supp. 2d 540, 553 (S.D.N.Y. 2013) ("The city adopted a policy of indirect racial profiling by targeting racially defined groups for stops based on local crime suspect data, which resulted in the disproportionate and discriminatory stopping of blacks and Hispanics in violation of the Equal Protection Clause[.]").

By ignoring these facts, the guidelines participate in the phenomenon of collective amnesia about race and space in America that historian and academic, Richard Rothstein, wrote about in his book *The Color of Law: A Forgotten History of How Our Government Segregated America*:

> Half a century ago, the truth of *de jure* segregation was well known, but since then we have suppressed our historical memory and soothed ourselves into believing that it all happened by accident or by misguided private prejudice. Popularized by Supreme Court majorities from the 1970s to the present, the *de*

---

[9] *See* NAACP, *Drug Sentencing Disparities*, https://www.naacp.org/criminal-justice-fact-sheet/; and Mueller, Benjamin, et al., *Surest Way to Face Marijuana Charges in New York: Black or Hispanic, New York Times*, May 13, 2018, https://www.nytimes.com/2018/05/13/nyregion/marijuana-arrests-nyc-race.html.

[10] *See* Gramlich, John, Pew Research Center, *Black imprisonment rate in the U.S. has fallen by a third since 2006,* May 6, 2020, https://www.pewresearch.org/fact-tank/2020/05/06/share-of-black-white-hispanic-americans-in-prison-2018-vs-2006/.

*facto* segregation myth has now been adopted by conventional, liberal and conservative alike.[11]

The irony is that by ignoring this critical part of the American character, the guidelines, in fact, call their self-lauded empiricism into question. Accordingly, these are important factors we respectfully ask the Court to consider in applying a variance for Mr. Walker. *See discussion United States v. Bannister*, 786 F. Supp. 2d 617, 688-89 (Jack B. Weinstein) (E.D.N.Y. 2011) ("Had the defendants been raised by cohesive, adequate families, most of the difficulties they encountered would probably never have come to pass. Well-resourced, attentive parents would have had the knowledge, ability, and insight to protect their children from many of the difficulties that befell these defendants in their youth, to obtain assistance to deal with their psychological and physical problems, and to obtain crucial opportunities for education, work, and personal growth. Even those with learning disabilities would likely have been provided available resources to overcome their impairments at public expense. That the defendants were born into circumstances without such support is at the center of this tragedy.").

Post *Booker*, we can continue to acknowledge that safe environments, resources, and expertise add to a child's prosperity and potential, but a child lacking the same can be subverted and diverted from who they can become. This common sense is at the core of individualized sentencing and calls into serious question the guideline's dogmatic disavowal of how reality operates. *See, e.g.*, U.S.S.G. § 5H1.12 ("Lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted.").

### 2. Drug and Alcohol Dependence, Mental Health, Efforts at Rehabilitation, Family Ties, Collateral Consequences, Age, and Conditions of Confinement

To cope with his adverse circumstances over the years, Mr. Walker has used alcohol and controlled substances. While drug or alcohol dependence or abuse is not considered relevant under the guidelines, *see* Guideline § 5H1.4, an effort to end drug or alcohol dependence through rehabilitation may be. *United States v. Maier*, 975 F.2d 944, 948 (2d Cir. 1992) (the Second Circuit held that the awareness of one's drug dependence "and the demonstrated willingness to act to achieve rehabilitation, thereby benefiting the individual and society," is a reason for an adjustment). Mr. Walker has benefitted from drug and alcohol treatment in the past, and, again, asks the Court to recommend that he be provided with drug treatment while incarcerated.

Mr. Walker's mental health is another basis for a non-guidelines sentence. Pursuant to 18 U.S.C. § 3553(a)'s mandate sentencing courts should consider the need to provide medical care, or other treatment to offenders. Even under the guidelines regime, a defendant's physical condition "may be relevant in determining whether a departure is warranted, if, individually or in combination with other offender characteristics, it is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." *See* U.S.S.G. § 5H1.4; *see also United States v. Rioux*, 97 F.3d at 663 (2d Cir. 1996) (upholding district court's conclusion that, in combination, defendant's medical condition and charitable and civic good deeds warranted downward departure); and U.S.S.G. § 5H1.4 ("Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually

---

[11] *See,* Rothstein, Richard, *The Color of Law: A Forgotten History of How Our Government Segregated America*, at xii.

13

or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."). Mr. Walker has a documented history of depression and psychosis and has been hospitalized for these conditions. So this factor should also be considered.

Despite many hardships, Mr. Walker has struggled to better himself. He received his GED, and he has been a tutor, and has completed many classes and attended college while incarcerated. Mr. Walker's sentence should reflect these efforts because they demonstrate his struggle to improve his life, and weigh in favor of a variance. *See, e.g., Pepper v. United States*, 562 U.S. at 492-93 (2011) ("postsentencing" conduct is an important factor).

Mr. Walker's family ties are also significant, and his absence has been deeply felt, as his mother describes, "My son had a hard life since he came into this world. I was a teenager when I had him during this time I was an alcoholic. He spent his life being in an out of jail. My son is not a bad child it's just people places and things that have my son in jail. He had never disrespected me. I love my son he is my only son so please spare his life. … Please allow me and my son to spend time with each other." Further, Shameke's mother and grandmother have serious health issues. *See, e.g.*, *United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) ("the families of defendants are the intended beneficiaries of downward departure on the grounds of extraordinary circumstances relating to family responsibilities").

Further, we hold no illusion of how difficult it will be for Mr. Walker to rebuild his life once released. He will continue to suffer the collateral consequences of being a convicted felon, which can dramatically impact one's ability to find a good job and support a family. So, we respectfully ask the Court to consider this a mitigating factor, consistent with § 3553(a)'s directive. *See United States v. Stewart*, 590 F.3d 93, 141 (2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence.").

Mr. Walker's age is also relevant to the Court's consideration. Generally, older people are less likely to commit further offenses. *See United States v. Lucania*, 379 F.Supp.2d 288, 297 (E.D.N.Y. 2005) ("post-*Booker* courts have noted that recidivism is markedly lower for older defendants.").[12]

Finally, this discussion of Mr. Walker's background and characteristics is not an excuse for his conduct. However, it illustrates how we, too often, hold the most vulnerable, in our society, the most accountable, and it is properly offered as a basis for a variance. As Supreme Court case law and statutory authorities clarify, mitigation evidence is not permitted or presented as an excuse or justification for engaging in criminal conduct, but rather for mitigation of the length of sentence or type of punishment to be imposed. *See Lockett v. Ohio*, 438 U. S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *see also*, 18 U.S.C. § 3661 and 21 U.S.C. § 850. As Justice O'Connor noted in her concurring opinion in *California v. Brown*, 479 U.S. 538 (1987), evidence about offenders' backgrounds and character is relevant because of the belief, held by this society, that people who commit criminal acts that are attributable to

---

[12]U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, (December 2017) (demonstrating the strong influence age exerts on recidivism – older offenders are substantially less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

14

disadvantaged backgrounds, or emotional and mental problems, may be less culpable for sentencing purposes than those who have not had such experiences. *Id.* at 545.

### 3. Harsh Detention Conditions

Mr. Walker's confinement conditions should be considered in determining his appropriate sentence, including being incarcerated during the pandemic. *See, e.g., United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 (2d. Cir. 1996); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004); and *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 181004, at *7, 8 (S.D.N.Y. Sep. 30, 2020. And while the pandemic has subsided, Mr. Walker, will, like all prisoners, continue to be impacted by the hardships of quarantines, lockdowns, and limited social visits because of the lingering impact of the pandemic.[13] We do not wish to overstate the point. Mr. Walker is relatively healthy. But to prevent outbreaks, prisons lock down inmates in their cells for weeks at a time. This warehousing leads to little to no rehabilitative and educational services being offered.

### F. Conclusion

We respectfully urge the Court to impose the same sentence from May 18, 2018: a non-guideline sentence of time served on Counts One and Four (from June 16, 2015 to May 18, 2018 – 34 months) and 120 months on Count Three for a total sentence of 154 months.

Mr. Walker respectfully reserves the right to raise additional issues, if necessary, at the time of sentencing.

                                                     Respectfully,

                                                     /s/
                                                     Michael Hueston, Esq.

cc:    A.U.S.A. Andrew McDonald

---

[13] FBOP, *COVID-19, Coronavirus*, https://www.bop.gov/coronavirus/.